I'm here for the appellant in this case, Joseph McGunigle. I'm going to address the First Amendment issues to begin with. Judge Taylor found in this case that Mr. McGunigle was speaking on a matter of public interest. He assumed that he was speaking as a private citizen. However, he found that the employer's interest, the Police Department of City of Quincy, outweighed Mr. McGunigle's interest in his First Amendment speech and the public's interest in hearing those. The usual case is the Pickering case, which sets out a multi-part test for evaluating the employer's interest versus the citizen's interest. It's a multi-part test, but it suggests various factors that can be weighed to go to the ultimate question, which is whether the Police Department's interest in retaining efficiency outweighed the First Amendment rights to speak. Here, the defendants in this case have offered absolutely no evidence to show that Mr. McGunigle's speech actually caused any disruption in the Police Department. Don't you need to determine he was speaking as a citizen and not as a public employee? He is, Your Honor. Yes, that is the first test. The video is in the record, and he says to explain his conduct that's at issue, he says he was just doing his job. That's what he said. But that's, there's a video, but there are also a number of other things in the record in this case, and they include the other newspaper articles or statements, the fact that he talked to reporters, the fact that he had the mayor and representatives to his house. And what he's explaining in these is why he was walking around handing out these summonses. Well, he handed out summonses, but he also made numerous complaints to the dog officer. He made them as a private citizen. He attended a meeting. Well, how do you know he made them as a private citizen? I mean, that's a conclusion. A police officer is perfectly capable of making complaints to the dog officer. It happens all the time. That's certainly true. Was there some specific conversation where he said to the dog officer, now, Joe, I'm not complaining as a cop here, I'm talking as a private citizen? Something from which we could draw that inference? Certainly. For one thing, he issued citations, but he also made complaints to the dog officer. Yeah, but that's perfectly consistent with being a police officer and doing your job. But he's there. He also is a resident. He's there. He makes observations. He's making them when he's off-duty. He's calling from his cell phone. He's calling from his house phone. His wife is making them. This wasn't even his patrol area. So when he's to make a complaint, he's got to make an observation. He's there off-duty. But he was issuing citations off-duty also. He issued citations on and off-duty. In that area that wasn't his patrol area. Yeah. Right. So how do you say we should deal as a private citizen because it wasn't his patrol area, but he's out there operating as a police officer in that area, and then when a big newscast generates about it, he explains he was just doing his job? As the other articles, Your Honor, I mean, to the extent he issued citations, he could only issue a citation as a police officer. But to the extent that he raised the issue and complained about the city's policy of non-enforcement, there was a policy of non-enforcement here, he's doing it as a private capacity. Even in that video, he appears in plain clothes. He doesn't represent himself as a police officer. I know that the news station captioned him as a police officer, but he doesn't have any control of that. Well, he does if he'd said, I was doing this as a private citizen, but instead he said he was doing it as a police officer. I agree. So to my surprise, the news said he was doing it as a police officer. I suggest that he also made numerous complaints and raised the issue as a private citizen. He talked, and in this he's criticized, he talked about the impact on his house and his enjoyment of the beach, that he brought a house there. It all started when he moved to the area. Your Honor, he'd been a police officer for 10 years previously. He's complaining about what was going on in this area. It did come to an issue of public concern. Again, there was a meeting there, which the mayor attended, numerous city officials attended, 60 people attended in a small town. That's a large turnout in a small town over an issue, and he was a vocal person involved in that. He wrote letters, he complained to the mayor. Again, he had a city councilor present. Not all of these and most of these did not occur in his official capacity. In fact, in the record, there was an incident where he did not attend a hearing because he was on duty and was told he couldn't attend in his official uniform. So he did not attend the meeting. So I think there's ample evidence that he acted in many ways as a private citizen in making many of these statements. How do you address the causation gap? The newspaper articles that you point to, as I understand it, were five years before the action of which you're complaining. We sometimes find six months too much. Well, I understand, and that's a significant issue in this case. Let's rise to the question. In short times, plaintiffs will rely on the temporal proximity to the case. I'm not relying on temporal proximity to the case. I am relying on the fact that there are numerous incidences of actions taken against him over the series of five years for which there's no basis. Ultimately, for causation, the standard is sufficient evidence to permit a jury, and as you know, it's largely a jury question here. But when you talk about actions taken against him, we're concerned, for the purpose of this case, with adverse employment actions. And it seems to me that the only two actions, I think, that rise to that level, arguably, are the loss of his permission to carry a gun and his discharge from the police officer. And both of those are subject to the five-year gap that Judge Cayotta mentioned. That's certainly true, Your Honor. So the fact that he was continually in and out of more minor scrapes over the intervening years, it seems to me, doesn't do much in terms of the temporal gap, the causation gap. But it's the causation, again. I'm not relying on temporal proximity, except in the way that I'll come to in a moment. And that is, even if those are the only two adverse actions, and there's certainly not adverse employment actions when you fire, but even if there are only two, we can still look at the conduct to see whether or not there's evidence of Chief Keating trying to fire him over a series of years into stopping the complaints, stopping his actions. But isn't the case particularly weak against Chief Keenan, who wasn't even the chief when this allegedly protected conduct occurred? I mean, it seems to me if Keenan had it in for this fellow, logic would dictate it related to something other than stuff that occurred when his predecessor was chief. Well, Keenan is on record as saying that he disagreed with Arbitrator Bollinger's decision, that he thought he should have been able to enforce it. He thought he should have been able to discipline him. He's on record as saying he had personal animosity towards McGonigal. And if you go ultimately to what happens here, I mean, he couldn't find a way to fire him for cause. You know, for the kind of conduct that police officers get fired in a labor arbitration, we get a progressive discipline. If they're ruled, they get a five-day suspension or a couple-day suspension. It goes on. When he couldn't do that, he resorted to the unique method of taking away his handgun license, which effectively deprived him of any just cause determination that McGonigal would have been entitled to either in arbitration or in civil service. The gun was initially removed, though, in response to a letter he submitted from his physician. Right. So in 2009, his brother has a serious criminal problem. He needs time off. His doctor writes one short letter saying he's got a mental health issue. The chief jumps on that and says, I'm going to send you to the town psychiatrist, city psychiatrist. When you say jumps on that, what would someone be saying if he didn't? I'd jump on that, Your Honor. But then I would look at what happened. McGonigal said, no, that's not a mental health issue. He had the same doctor clarify. The same doctor writes two letters and immediately clarifies that he has no mental health issue. Nevertheless, Chief Keenan sends him up for the testing, which he can and had a right to do. However, what happened is that doctor completely cleared McGonigal's set of records and he's got no issues and no problems. Subsequently, in 2012, what happens is on March 9th of 2012, the mayor accepts a recommendation from the city's own hearing officer for a 30-day suspension on something that Keenan had wanted to fire him for. Three days later, Keenan suspends or revokes his handgun license. You're referring to the Cone incident. The Cone incident was in July of 2009. It led to an investigation by a hearing officer, Lane, who was the town's appointed hearing officer. It's not an impartial hearing. Lane renders his decision, doesn't find on two of the counts, including the untruthfulness count, and does find that he was rude and recommends a 30-day suspension. On March 9th, the mayor accepts the recommendation, suspends him for 30 days. On March 12th, Keenan goes back and says, well, you know what? I'm going to revoke your handgun license and terminate you, which effectively ended his career as a police officer, ended his ability to get a just cause review. Based on none of the facts, nothing happened. In 2009, we bring it up. Why does it end his opportunity to get a just cause review? I thought he grieved that. He grieved it. And ultimately, the arbitrator said, I cannot review the district court's opinion. I cannot go back and change the fact that he's lost his handgun license. Since he has no handgun license, he can't work as a police officer. But there was a court proceeding in which the revocation of the handgun license was upheld. And the difference is the standard, Your Honor. And it's noted by Arbitrator Bollinger that there's a world of difference between the employer having to prove just cause. He wants civil service and arbitration. And the standard of review in this case, which essentially is that the chief can point to any reasonable argument. He doesn't really have to prove the truth of it. Then it gets sustained. But it got sustained. And there was no further appeal to the SJC. Right. There was no further appeal to pass the superior court. Right. Because they both said he can point to a reasonable decision. The First Amendment issue. So that makes it just cause. The standard is not just cause. The standard is, is there any reasonable ground that the chief can point to? That's all he's got to do. I mean for the termination. For the termination, revocation of the handgun license. Once the loss of the handgun license is upheld, it seems to me the chief had no choice but to discharge him. The chief? And so your claim has got to be that the deprivation of the handgun license was the critical act of discrimination. But that's been upheld following an adversary proceeding in the courts. But not one in which that court considered First Amendment claims. It's a court of limited jurisdiction. So it was not decided. The First Amendment issue was not decided and could not have been argued. And what factual information in the record links the 2007 statements to the newspapers about what's happening in his neighborhood to what occurs five years later when the gun permit is revoked? Now, I say that there's a series of events that I'll line in brief. I can go through them quickly, which show a continued animosity, continued good intent. In particular, I go to the Dabbingdown case, which says it's ultimately a question of pretext. And I say it's somewhat like the employment discrimination case. But if the reason's advanced, if the reason's articulated, but the actions are false, then a jury can infer a pretext. And most of the things that are advanced here are simply false, not supported by the record. They wouldn't have been sustained. Everything down to the timing of it, which is something that Dabbingdown looked at. Dabbingdown, there was an investigation going on. It was about to clear the office of misconduct. When that happened, then the employer started a new investigation to come up with a new charge. Here, as soon as the mayor says, I'm not going to fire you, three days later, the chief suddenly decides he's got to terminate him. And again, in 2009, he said, I need to have a medical professional make a decision about his competence to handle a firearm. He gets a clean bill of health from him. In 2012, all of a sudden, Keenan doesn't need a medical professional. He can just, and he does, just terminate his handgun license. And once he did that, it was a fait accompli. There was nothing that could be done at that point that was going to allow him to keep his job. What was the issue that the court did decide, though, on the appeal on the handgun revocation? Didn't it decide that was justified, but it didn't have jurisdiction to go find whether an expulsion of motivation would be relevant? He's only asked could he point to a reasonable ground. And the standard is a minimalist approach. And so it held that there was a reasonable ground. Yes. And you weren't allowed to then say, but there might have been some other ground, a mixed motive. It's a statutory, it's by statute, it's an incredibly deferential statute to the chiefs of police. But aren't we bound, then, by the finding that there did exist a reasonable ground, leaving for the federal action to determine whether that was the motivation? I don't think you can restore his handgun license. I think that's a done deal. Then how can he be a policeman? He can press his First Amendment violation. If he was fired because his First Amendment rights were violated, then he has a traditional damages right. So you're saying he has a claim for damages, though not for reinstatement? That's correct. But he does have a claim for damages. He does have a First Amendment case. And that's the argument here on causation. Thank you, my friends. We're almost out. Good morning or almost afternoon. I'm Attorney John Hitt for the city of Quincy. I would like to point out that this court can affirm the summary judgment decision here on any ground that appears manifest in the record and that you're not necessarily bound by the decisional calculus of the district court here. Though the decisional calculus of the district court provides a very good road map for walking through the issues in this case. Applying a three-part test that pertains to this type of First Amendment retaliation case, I'm going to turn first to the second factor, which is the Pickering balancing test. And this is a question of law for the court. It's something that the court can decide. And here, reasonably, it did decide that the balance tipped in the favor of the public employer, the police department, and not in the favor of the public employee, former Officer McGonigal. The fact that you're starting with the Pickering balancing test, should that lead us to infer that you think that's your strongest ground for affirmance? No, not necessarily. I think there are multiple strong grounds, any one of which would support the summary judgment decision. I can easily talk about whether he was speaking as a citizen or a police officer on the first part of the test. I think the record indicates that he was speaking very much as a police officer and had clothed himself in the power of his office as a police officer, wrapped his speech in the unprotected acts of issuing citations to his neighbors, and went about his speech, whatever it was, in a way that alluded to his authority as a police officer. In fact, the very comments that are at issue here on the Channel 7 TV report, he makes reference to, as he does with the Boston Globe article, makes reference to the fact that he's enforcing the law, and trying to enforce the law and keep the neighborhood safe down here, and really wraps himself in his office in a way that makes his claim of speaking as a citizen very minimal. And the district court went through a very good analysis of laying out why, to the extent that he might have been speaking as a citizen here, it was far outweighed by his speech as a police officer. Turning now back to the second part of the test, here my brother argues that there was no support in the record for the district court's conclusions about the tipping of the hickering balancing test in the favor of the police department. There is evidence in the record that supports the conclusion reached by the district court. That evidence is found in an affidavit, in one place, in an affidavit of Chief Keenan, which appears in the record, I believe, at supplemental appendix page 522 or 524, right in that particular area of pages. In that affidavit, Chief Keenan spells out the legitimate law enforcement interests at stake for the police department. Additionally, as Judge Saylor noted in his decision, this court has previously recognized in the current case, and the Supreme Court has recognized as well, the very significant law enforcement interest or the additional weight that should be given to a law enforcement entity as a public employer in the First Amendment retaliation context. Does the five years on the hickering test, does the five years, which substantially helps you on causation issues, actually cut against you? Because the proposition of the hickering test is that they did fire him because of his speech, but it's okay because we're balancing that speech against the very important departmental concern that the operations of the police department not be disrupted by the speech. Well, how can they maintain that disruption argument if they wait five years to fire someone for their speech? Well, I don't think, I think we're kind of caught in the nature of the test in terms of addressing the second prong here. Officer McGonigal wasn't fired because of his speech. No, but if you wanted to rule on the hickering argument, then don't we have to assume, doesn't that argument assume he was speaking as a public citizen? Because if it weren't, we'd never get to that. And doesn't it also assume that it was what he was doing was why he was fired? I would ask that the court rule on the first issue first as it moves through the series of steps. He wasn't speaking as a public citizen. But then we'd never get to the hickering and balancing. Right, so it's an alternative argument. But I thought you were just arguing that you should win under the hickering and balancing, which is what I understood the district court had. But we have the same problem if we do rule against you on the speaking as a public citizen argument, then we face the hickering argument. So ultimately, isn't what Judge Saylor did pre-March, was assume everything else against you and rule on the causation element? Yes, Your Honor. And on the causation element as well, turning to that, temporal proximity here is nowhere even close. You can also, and we did and do make the argument that there's a question whether there were any adverse employment actions that are actually actionable in this particular case. Whether or not the termination. The firing is certainly, that's an adverse employment action. Whether or not it was having relation to the speech is arguable. Right, I would agree it would be an adverse employment action. However, the plaintiff here sought to amend the complaint to add this into their complaint in this case. And Judge Torr denied that motion to amend on witness grounds. His reasoning was that they had waited too long to try and amend the complaint to add the termination in. And that denial hasn't been appealed? And that denial has not been appealed. Okay. What about the revocation of the gun permit? The revocation of the gun permit, that was decided by the district court in Massachusetts. It was affirmed on appeal by the district court. But I mean, isn't that an adverse employment action for purposes of this case? It is an adverse employment action, yes. But it's a decision by which this court is bound. Are we bound by it? I mean, it seems to me there is case law that says an employer can't fire someone just by resorting to some good reason. If it can be shown that the real reason is a pretext. You can't fire someone for being late three or four days for work, even though that's a perfectly good reason. If there's some evidence in the record that shows you were gunning for this particular employee because he was, write in your own word, African American, Jewish, some discriminatory reason. But there's no such evidence here, Your Honor. Well, that's a different question. But it is an adverse employment action, and we have to go beyond the fact that there was a reasonable ground to support it. Because the claim here is that this so-called reasonable ground was dredged up as a pretext. That's the claim, and you've got to explain to us why that's facetious or insupportable on this record. Right, and I think we have, Your Honor, in our brief. This court should give deference to the decision of the district court and the superior court in the various actions relating to revocation. But what deference? As I understand it, and correct me if I'm wrong, it ruled that reasonable grounds existed for taking away the gun permit. Yes. Did that finding mandate the revocation of the gun permit? No. So there was discretion. It was discretion of the chief. And then the claim here is that the chief exercised his discretion in order to punish the speech. So we do have an adverse employment action, and we need to go back to the causation question. Right. But again, in terms of there's nothing that ties together that makes that causal connection for the plaintiff in this case. There is nothing that ties any action of the chief. And in fact, the record here indicates he would have taken the same action before. The allegation is that even though it's five years, they were chipping away at him for over the five-year period of time. And this was finally the coup de grace. And so the five years is all bound together by repeated attempts to get him. Right. But there's no evidence of these repeated attempts to get him other than the plaintiff asking this court to draw unreasonable inferences, as it asked the district court to do, to draw unreasonable inferences that they were out to get him. There's absolutely no evidence in the summary judgment record that they were out to get him. And the fact that they took an action that was ultimately adverse to his employment does not suggest that his speech was the motivating factor. And that gets us back to this kind of running around and chasing our tail on the temporal proximity. You know, here this is a case where you have a passage of five or more years, and it's nowhere close what it needs to be in terms of the close temporal proximity. I would rest on our brief for our other points. Thank you very much. Thank you. Thank you, Your Honors. Jeffrey Morris, I represent the individuals, Chief Keenan and Captain Dugan, in this case. And I have three principal issues with respect to that qualified immunity, that Civil Rights Act, and the defamation claim against Chief Keenan. On the qualified immunity argument, I would rely on the confusion about what Mr. McConnell's role was. Was he a police officer? Was he a citizen? The confusion about taking a gun. But if we find that a jury could conclude that the chief took away his gun permit because of his speech, what qualified immunity do you have? And if we don't find that, you win on the merits. So why are you talking to us about qualified immunity? Because I want the individual. It's not going to change to not individually on the hook, Your Honor. I mean, the whole purpose of qualified immunity, I mean, it didn't work on the motion of dismissal in this case, but it's to protect individual defendants from discovery and potential liability for reasonable decisions they made in employment that might have, assuming their right was clearly established, violated the Constitution or statute. So we think they're entitled to qualified immunity. On the Mass Civil Rights Act, by and large, I piggyback onto my brother's arguments about the 1983 claim. They're substantively the same under state law. Is there any evidence in this case at all of coercion, threats, or intimidation? Well, our position is no, Your Honor. The plaintiff has raised two issues. One is supposedly at some point the mayor of Quincy made a statement that Mrs. McGonigal should drop the issue. Well, first of all, the mayor is not a defendant, and under the Mass Civil Rights Act, only individuals are liable. So if he's not here, he doesn't matter. There's no evidence linking this alleged statement to either Dooner or Keenan. There's no statement under the hearsay of the plaintiff or a double or triple hearsay of the plaintiff that the statement was ever made anyway. And Mrs. McGonigal is not a party in this case either. So this is a red herring. The other issue raised by the plaintiff is Captain Dugan allegedly warning Mrs. McGonigal that he'd be fired if he didn't watch himself. And we point out in our brief that there's no record citation to that in the plaintiff's brief. So we're not sure exactly what he's referencing. There is a statement in the record, in the record appendix on 139, where I believe it was from Mr. McGonigal's deposition. He supposedly said that Captain Dugan said to a union representative he'd better watch it or it'd get canned. That is time-bound under Judge Soros' order, for one thing. It's at least double if not triple hearsay, and it wasn't said to the plaintiff anyway but to a union representative. So we don't think there's any evidence under the Mass Civil Rights Act, even if you get past there being a core constitutional issue at stake here, that constitutes either threats, intimidation, or coercion from either of these two as individuals. Finally, we come to the defamation claim. This relates to Chief Keenan individually. And as Judge Saylor found below, there is no evidence in the record anywhere of actual malice. The plaintiff is a public figure. He has to be able to show that Chief Keenan acted with actual malice. He hasn't been able to do it. And even though the case started with four or five allegedly defamatory newspaper articles, we're down to two alleged statements now. In Record Appendix 49, Chief Keenan is quoted as saying, Mr. McGonigal's version differed considerably from all the eyewitness versions. My truthfulness for a police officer is a serious infraction. Everybody agrees the second sentence there is perfectly accurate and true. And it's certainly Chief Keenan's either observation or opinion that Mr. McGonigal's version of events in the hearing that they were talking about did differ considerably from all the eyewitness versions. So if you look at the actual entire article in context, both articles, then it's all about the plaintiff's employment difficulties with the city, and this was the Chief's take on that. It's either opinion or it's true, but it was made in response to media inquiries concerning the contested discipline of a public employee, which the public has a right to know about, and the Chief has a free speech right to say what he thinks about something, too. And the fact of the matter is that Mr. McGonigal was charged with untruthfulness, and that was the Chief's opinion. The hearing officer didn't find that Mr. McGonigal truthful, he simply found that the city had not carried his burden to show that he was untruthful. The other article is a March 21, 2012 article. This is the witness intimidation article. Unless you have any further questions, thank you for your time. Thank you.